# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JOHN NELSON,

      Plaintiff,

      v.                               Case No.  13-CV-37

COUNTY OF MILWAUKEE, and
DAVID A. CLARKE, JR.,

      Defendants.

## DECISION AND ORDER ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

John Nelson ("Nelson") brings this lawsuit against Milwaukee County and Milwaukee County Sheriff David A. Clarke, Jr. ("Sheriff Clarke") (collectively "the defendants") alleging sex and race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981, deprivation of rights under the equal protection clause in violation of 42 U.S.C. § 1983, and retaliation in violation of Title VII and § 1981. The defendants move for summary judgment on all of Nelson's claims. For the reasons that I explain in this opinion, the defendants' motion for summary judgment is granted.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the

applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc.,Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## UNDISPUTED FACTS

Nelson began his employment with Milwaukee County as a Corrections Officer in October 1994. (Defs.' Proposed Findings of Fact ("DPFOF") ¶ 1, Docket # 38 and Pl.'s Resp., Docket # 47.) Nelson accepted a position as a Deputy Sheriff with the Milwaukee County Sheriff's Office ("MCSO") in 1995. (*Id.* ¶ 2.) At all times pertinent to this action, Sheriff Clarke was the elected Sheriff of Milwaukee County. (*Id.* ¶ 3.) In January 2002, Nelson was promoted to the rank of Sergeant. (*Id.* ¶ 4.) In August 2009, Sheriff Clarke

temporarily promoted Nelson to the higher classification of Lieutenant. (*Id.* ¶ 5.) In January 2010, Sheriff Clarke made Nelson's promotion to the rank of Lieutenant permanent. (*Id.* ¶ 6.)

Milwaukee County has an electronic system known as Ceridian that is used for applicants to submit applications for open promotional positions. (*Id.* ¶ 65.) Milwaukee County began using the Ceridian System in 2008, and the MCSO used it for the 2008, 2010, and 2011 Deputy Sheriff Captain promotional openings. (*Id.* ¶ 66.) Applicants submit their information through this online system and once the submission deadline passed, the Human Resources Director assigned Human Resources Analyst James Tate ("Tate") to review each applicant's application, resume, and candidate qualifier questions to determine whether the applicant met the minimum requirements for the position. (*Id.* ¶ 71.) Tate screened candidates' training and experience and, using a standardized rating form, provided each candidate with a numerical score up to 100. (*Id.* ¶ 72.)

Through this process, candidates are evaluated based on the face value of the application, taking as true each candidate's answers and qualifications. (*Id.* ¶ 73.) If a candidate met the minimum qualifications and received a score of 70 or higher on the training and experience examination, Human Resources placed the candidate on a certified eligibility list. (*Id.* ¶ 75.) If it was determined that an applicant was not qualified for the position, Human Resources notified him or her by letter that his or her application had been declined. (*Id.* ¶ 76.)

After the applicant was notified that she or he did not meet the minimum qualifications, the applicant was permitted to contact Human Resources to provide additional information. (*Id.* ¶ 77.) Once an applicant contacted Human Resources and

provided additional information, Human Resources would re-review the applicant's information and determine whether she or he should be placed on the amended certified eligibility list. (*Id.* ¶ 78.) Once a certified eligibility list was created, Human Resources checked a box in the Ceridian System, which emailed a list of names without a ranking or score to Marlo Knox ("Knox"), Human Resources Manager for the MCSO. (*Id.* ¶ 79.) Knox then forwarded the certified eligibility list of names to Inspector Richard Schmidt ("Inspector Schmidt") (who, along with Inspector Edward Bailey, are the highest ranking officers below Sheriff Clarke), who forwarded the list to Sheriff Clarke to select a candidate. (*Id.* ¶ 80.)

A position was posted for Deputy Sheriff Captain in October 2008, to which Nelson applied, and Nelson was included on the list of certified candidates. (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 2, Docket # 46 and Defs.' Resp., Docket # 54.) There were four promotions from this 2008 list, including two white males, one black female, and one Hispanic female. (*Id.* ¶ 3.) Another list of certified candidates was created in December 2010, on which Nelson was included. (*Id.* ¶ 4.) From this list, six people were promoted to the position of Deputy Sheriff Captain, including three white males, two white females, and one black male. (*Id.* ¶ 5.)

In August 2011, Knox wrote to the interim director of human resources for Milwaukee County, Candice Richards ("Richards"), requesting that the sheriff's department captain list be abolished as Inspector Schmidt changed the minimum requirements for the position. (*Id.* ¶¶ 6-7.) In September 2011, it was decided that the new list would only draw from current or prior lieutenants, of which Nelson was one. (*Id.* ¶ 7.)

In October 2011, Knox asked Tate whether Debra Burmeister ("Burmeister"), a white female, was on the Sheriff's Office captain list; Tate responded that Burmeister was not on the list. (*Id.* ¶¶ 8, 26.) Burmeister was out of town and Knox waited to post the captain's position until Burmeister returned to town. (*Id.* ¶ 11.)

In November 2011, the MCSO opened up several promotional positions for Deputy Sheriff Captain. (DPFOF ¶ 62.) The MCSO created the promotional announcement, the rating forms to evaluate applicants, and the application questions. (*Id.* ¶ 63.) Inspector Schmidt was provided a captain announcement and signed it on November 23, 2011, which Knox forwarded to Tate. The announcement set minimum qualifications of ten years of experience within the MCSO; one (1) year of supervisory experience including hiring, firing, and disciplining of staff; being certified as a sworn law enforcement officer with the Law Enforcement Standards Board, with all minimum requirements being possessed at the time of the application filing deadline which was set at 11:59 p.m. on December 5, 2011. (PPFOF ¶ 12.) Once Knox secured approval for the posting from Inspectors Bailey and Schmidt, she sent the information to the Human Resources Department to create the physical announcement and to open the position in the Ceridian System. (DPFOF ¶ 64.)

On November 28, 2011 at 8:49 a.m., Knox forwarded the captain announcement to Nancy Evans ("Evans"), a black female, and Burmeister, a white female, to let them know the captain position was open for applications. (PPFOF ¶ 14.) Both Evans and Burmeister confirmed to Knox that their applications were complete at 12:26 p.m. (*Id.* ¶ 16.) Then, on November 28, 2011 at 4:17 p.m., Knox forwarded the captain position announcement to all supervisors to be read at all roll calls. (*Id.* ¶ 17.) Knox acknowledged that she erred in

sending the announcement to Evans and Burmeister before sending the announcement to everyone. (*Id.*)

Nelson testified that he went on the Ceridian website on November 29, 2011 and believed that he applied for the position of Deputy Sheriff Captain. (Declaration of Oyvind Wistrom ¶ 2, Exh. 1, Deposition of John Nelson ("Nelson Dep."), Docket # 44-1 at 108.)) However, he later learned that the Ceridian System showed that he had not applied for the position in fall 2011. (*Id.*) Nelson contacted Knox on November 29, 2011 to let her know he applied for the captain position again and told her he would stop by the next day to speak with her to get confirmation of his filing to which Knox responded by telling him to log in the recruiting system and view his profile. (PPFOF ¶ 19.) On December 19, 2011, when Nelson realized that the Ceridian System did not show he applied for the position, he attempted to submit his application to Tate via email. (DPFOF ¶ 106, Nelson Dep. at 134-36.) Tate indicated that he would not accept Nelson's application because the Department was no longer accepting applications, and while the Ceridian System showed he applied for a Deputy Sheriff Captain position in 2008 and 2010, it did not show he applied in 2011. (*Id.* ¶ 107.)

On December 13, 2011, a list of certified candidates for the captain position was given to Knox, which included three individuals: William Brown, Debra Burmeister, and Donald Kernan. (PPFOF ¶ 21.) Evans was not initially on this list because she did not have ten years of experience with the MSCO. (*Id.* ¶ 22.) However, on December 13, 2011, Evans was added to the certified eligibility list because the Human Resources Director determined that the minimum qualification of ten years of experience with MCSO should include a candidate's service at the Milwaukee County House of Corrections ("HOC") before it was

under the operation and control of the MCSO starting in 2009. (DPFOF ¶ 92.) That same day, the updated list with Evans, Burmeister, Brown, and Kernan was forwarded to Sheriff Clarke and Burmeister and Evans were selected for the captain positions. (DPFOF ¶ 94; PPFOF ¶¶ 26-27.) At the time Evans applied for the position, she was becoming law enforcement certified; however, she did not become certified until December 9, 2011, after the December 5, 2011 deadline but before she was subsequently added to the list on December 13, 2011. (*Id.* ¶ 28.)

On December 16, 2011, Melanie Lehmann ("Lehmann"), a white female, and Anthony Moffett ("Moffett"), a black male, were added to the captain's certification list and Sheriff Clarke was alerted to this fact. (*Id.* ¶ 32.) On December 20, 2011, Human Resources amended the certified eligibility list, adding the following applicants: Thomas Liebenthal, Lehmann, Moffett, Dennis Konkel, Tricia Carlson, and James Sajdowitz (*Id.* ¶ 38.) The same day Sheriff Clarke was provided with the amended list and ultimately selected Moffett and Lehmann for the Deputy Sheriff Captain positions. (*Id.* ¶¶ 39, 41, 43.) Lehmann's application was initially declined because she did not have the required ten years of experience; however, it was later undeclined based on her HOC experience. (*Id.* ¶ 47.) Moffett was initially declined for lack of supervisory experienced, but was later undeclined as providing information showing hiring, firing, and discipline of staff at ACT Med. Records. (*Id.* ¶ 49.) On December 27, 2011, Sara Wronski was added to the list. (*Id.* ¶ 52.)

On December 30, 2011, Nelson filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that he was denied the 2011 promotion to Deputy Sheriff Captain on the basis of his race (white) and gender (male). (DPFOF ¶ 108.) Nelson continued to insist he applied for the Deputy Sheriff Captain position and on

January 5, 2012, escalated his complaint to the Director of Human Resources Kerry Mitchell, and requested a meeting with her regarding his placement on the certified eligibility list. (*Id.* ¶ 109.) It was ultimately determined that Nelson should be considered for placement on the certified eligibility list, which was done on January 20, 2012. (*Id.* ¶¶ 101, 115.) However, by this time, Sheriff Clarke had already promoted four people from the most recent eligibility list to the position of Deputy Sheriff Captain. (*Id.* ¶¶ 62, 94, 99.)

On January 24, 2012, Inspector Schmidt emailed Sheriff Clarke a copy of Nelson's EEOC complaint. (PPFOF ¶ 61.) The email stated: "John filed an EEOC complaint stating he was not promoted to captain because he is white and a male. I will hold my editorial comments, which will take extreme discipline." (*Id.*) Sheriff Clarke responded: "I'm not surprised. I think it's a move to offset his discipline case, then he'll cry retaliation. I won't be deterred by this in his discipline case. He'll get what I believe is appropriate." (*Id.* ¶ 62.) Inspector Bailey received a copy of Nelson's EEOC filing January 25, 2012. (*Id.* ¶ 63.) On January 31, 2012 Inspector Bailey sent Nelson an email that stated that: "Until further notice, you are not to attend command staff meetings. Information discussed at the meetings can be received, by you, through your chain of command." (*Id.*) Prior to this, Inspector Schmidt had ordered all lieutenants with arrest powers (which included Nelson) to attend the command staff meetings every week to gain information that was discussed such as training, potential new initiatives that were being carried out and reporting to each other what was taking place within their areas. (*Id.* ¶ 64.)

On January 31, 2012, a command staff meeting was held. (DPFOF ¶ 129.) Nelson was asked to leave either at the beginning of the meeting, or before the meeting began. (PPFOF ¶ 65.) There were assigned seats at command staff meetings and Nelson's nametag

was in front of his chair; and after Nelson left the meeting, the Sheriff got up in front of the room and began to talk about his ability to make promotions when he wanted and then pointed at Nelson's chair saying no one was going to tell him who to promote and mentioned something about loyalty indicating Nelson was disloyal. (*Id.* ¶ 67.)

On February 8, 2012, Knox informed Nelson that he was being transferred to the third shift jail records for a light duty assignment. (*Id.* ¶ 77.) During the afternoon of February 8, 2012, Nelson received a phone call from Lieutenant David Rugaber who advised him he was the subject of two internal affairs investigations that were from complaints made in October 2011, but Internal Affairs had been busy and was just getting around to them now. (*Id.* ¶ 80.) On February 10, 2012, Nelson filed a claim of retaliation with the EEOC regarding his exclusion from the command staff meeting and his transfer to third shift jail records. (*Id.* ¶ 85.) On March 15, 2012, Nelson accepted a position with the Milwaukee County Parks. (*Id.* ¶ 86.)

## ANALYSIS

Nelson brings his sex discrimination claim under the equal protection clause of the Fourteenth Amendment (via § 1983) and Title VII. He brings his race discrimination claim under these laws, as well as 42 U.S.C. § 1981. Nelson also alleges retaliation in violation of Title VII and § 1981. The Fourteenth Amendment prohibits states from denying any person the equal protection of the laws. Title VII prohibits employers from discriminating against employees or applicants on the basis of race, sex, religion or national origin. Section 1981 prohibits discrimination on the basis of race in the making and enforcing of contracts, including employment contracts. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975). Each of these laws applies to discrimination by state employers. *Alexander v.*

*Wisconsin Department of Health and Family Services*, 263 F.3d 673, 681–82 (7th Cir. 2001). I will address Nelson's discrimination and retaliation claims in turn.

### 1. *Sex and Race Discrimination Under Title VII, § 1981, and § 1983.*

Nelson alleges that the defendants discriminated against him on the basis of his sex and race in violation of Title VII and 42 U.S.C. § 1983 and on the basis of his race in violation of 42 U.S.C. § 1981. Nelson's claims of discrimination are analyzed under the same framework, whether brought under Title VII, § 1981, or § 1983. *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011). Thus, I will discuss all three of Nelson's discrimination claims together.

A plaintiff can establish discrimination under all three statutes using either the direct or indirect method of proof. *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 750 n.3 (7th Cir. 2006). The direct method requires that the plaintiff provide direct or circumstantial evidence of the employer's discriminatory animus. *Johnson v. General Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 727 (7th Cir. 2013). The indirect method, by contrast, requires the plaintiff to follow the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Id.* at 728. Under the *McDonnell Douglas* framework, after the plaintiff makes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its action. *Id.* Doing so shifts the burden back to the plaintiff to show that the employer's proffered reason is pretext, which then permits an inference that the employer's real reason was unlawful. *Id.*

1.1    Direct Method

Under the direct method, the plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Direct evidence is something close to an explicit admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it "uniquely reveals" the employer's intent to discriminate. *Id.* More common is circumstantial evidence, which "suggests discrimination albeit through a longer chain of inferences." *Id.* (internal citation omitted). A plaintiff can survive summary judgment by producing either type of evidence as long as it creates a triable issue on whether discrimination motivated the employment action. *Id.* Our cases point to three categories of circumstantial evidence: (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Id.* A plaintiff need not produce evidence in each category to survive summary judgment. *Id.*

Nelson does not argue—nor does the record show—direct evidence that the decision not to promote him was because of his sex or race. Given the lack of a direct admission, Nelson must provide a "convincing mosaic" of circumstantial evidence that directly points to discriminatory reason for the employer's action. *Davis v. Con–Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004). Nelson argues such circumstantial evidence exists, in the form of suspicious timing, ambiguous statements, non-white males getting systematically better treatment, and less qualified candidates than Nelson being promoted.

(Pl.'s Resp. Br. at 8, Docket # 45.) Nelson argues that the evidence shows that in December 2011, four persons were promoted to captain, none of whom were white males, and none of whom were on the pre-existing 2010 eligible list of captain candidates. Nelson further argues that the promotional process was "so tainted that one could only conclude it was for the purpose of discrimination to get these 4 non-white males to the rank of captain at the expense of plaintiff." (Docket # 45 at 3.)

Nelson is correct that none of the four individuals promoted to the position of Deputy Sheriff Captain in December 2011 were white males. However, the undisputed evidence shows that since 2006, Sheriff Clarke promoted twenty-eight individuals to the rank of Deputy Sheriff Captain and of these twenty-eight individuals, twelve have been white males, nine have been white females, two have been black males, three have been black females, one has been a Hispanic female, and one has been a Hispanic male. (DPFOF ¶¶ 84-85.) Thus, since 2006, Sheriff Clarke has promoted more males than females (15 males and 13 females), and more whites than non-whites (21 whites, 7 non-whites). (*Id.* ¶¶ 86-87.) Further, as a group, white males comprise the largest single category of individuals promoted to the position of Deputy Sheriff Captain by Sheriff Clarke. Thus, the evidence does not demonstrate that similarly situated employees outside of the protected group systematically receive better treatment.

Nelson generally argues that the process for selecting candidates for the Deputy Sheriff Captain in December 2011 was suspect and reveals that Nelson was overlooked for the position due to race and sex discrimination. He argues that the selection process was fixed to ensure that Evans and Burmeister were selected for the positions, even though

Evans was unqualified. Nelson further argues the certified eligibility list kept changing to include other unqualified candidates, such as Moffett and Lehmann.

Even drawing all inferences in a light most favorable to Nelson, he has failed to create a triable issue on whether discrimination motivated the defendants' decision to not promote him. Most significantly, although Nelson undisputedly intended to apply for the 2011 position (DPFOF ¶ 103), the Ceridian website showed that he did not (Nelson Dep. at 108). Nelson does not dispute that Ceridian was the established method for applying for the position (*id.* ¶ 65), nor does he dispute that Sheriff Clarke can only promote an individual to a permanent position if he or she is on a certified eligibility list provided by Human Resources (*id.* ¶ 81). Because Nelson was not on the certified eligibility list, he was not considered for the position. By the time Nelson was added to the list, subsequent to the application deadline passing, the positions had already been filled. Thus, Nelson cannot show a discriminatory reason for the defendants' decision not to promote him.

The fact that the eligibility list changed several times does not indicate discrimination. Nelson does not dispute that if an applicant was notified that he or she did not meet the minimum qualifications, he or she could provide additional information and subsequently be placed on an amended certified eligibility list. (DPFOF ¶¶ 77-78.) The evidence does not show that this policy applied only to females and non-whites. In fact, Nelson was added to a subsequent amended eligibility list after initially being declined.

Nor does the evidence show that Evans, Burmeister, Moffett, and Lehmann were unqualified for the position. Nelson concedes that Burmeister was qualified. Regarding the other three candidates, the MCSO decided to include time at the HOC in determining whether a candidate had the required ten years of experience with the MCSO. (*Id.* ¶ 92.)

The evidence does not show that this policy applied only to non-white males. Thus, given the inclusion of this time, Evans and Lehmann had the required years of experience. Further, even though Evans was not sworn law enforcement certified by the filing deadline, as required, she became law enforcement certified prior to her addition to the eligibility list. Although Nelson argues that Moffett and Lehmann did not have the requisite supervisory experience, he does not dispute that Moffett had one year supervisory experience at ACT Med. Records (PPFOF ¶ 49) and Lehmann had one year supervisory experience at Arby's restaurant (*id.* ¶ 48). There was no requirement that the supervisory experience be with the MCSO. (Declaration of James Tate ¶¶ 17-18, Docket # 42.)[1] Thus, Nelson fails under the direct method of proof.

### 1.2 Indirect Method

Under the indirect method of proof, a plaintiff can "avert summary judgment" by establishing a *prima facie* case of discrimination under the *McDonnell Douglas* formula. *Lewis v. City of Chicago*, 496 F.3d 645, 650 (7th Cir. 2007). To establish a *prima facie* case of a failure to promote claim, Nelson must show that (1) he is a member of a protected class; (2) he applied for and was qualified for the position; (3) he was rejected for the position; and (4) the position was given to someone outside the protected class who was similarly or less qualified than he. *Hobbs v. City of Chicago*, 573 F.3d 454, 460 (7th Cir. 2009); *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003). The presumption of discrimination created by establishing a *prima facie* case shifts the burden to the defendant "'to produce a legitimate, noninvidious reason for its actions.'" *Id.* (quoting *Atanus v. Perry,* 520 F.3d 662, 672 (7th

---

[1] Although Nelson objects to both paragraphs 17 and 18 of Tate's Declaration (Docket # 49) on the grounds that the declaration contradicts Tate's prior deposition testimony, the excerpts Nelson cites from Tate's deposition do not contradict the fact that Lehmann was undeclined on the issue of supervisory experience because of her time at Arby's and Moffett was undeclined because of supervisory experience at ACT Med. Records.

Cir.2008)). If the defendant rebuts the *prima facie* case, the burden then shifts back to the plaintiff to show that the reasons proffered by the defendant are merely pretextual. *Id.*

Again, Nelson's discrimination claim fails because he cannot show that he applied for the position of Deputy Sheriff Captain in 2011. If a plaintiff does not apply for a job vacancy that is posted, he cannot make a *prima facie* case for unlawful discrimination unless the plaintiff demonstrates that the employer's discriminatory practices deterred plaintiff from applying. *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 558 (7th Cir. 2004). The defendants do not dispute that Nelson applied for the captain position every time it was posted since 2004 with the exception of the 2011 position. (DPFOF ¶ 104.) As stated above, although Nelson undisputedly intended to apply for the 2011 position (*id.* ¶ 103), the Ceridian website showed that he did not (Nelson Dep. at 108). After he learned that he was not on the certified eligibility list, Nelson insisted that he had in fact applied and escalated his complaint to the Director of Human Resources, and was ultimately placed on the certified eligibility list. (DPFOF ¶¶ 109-115.) However, at the time Sheriff Clarke made the determination to hire Burmeister, Evans, Moffett, and Lehmann, Nelson was not on the certified eligibility list. Nelson does not dispute that Sheriff Clarke can only promote an individual to a permanent position if he or she is on a certified eligibility list provided by Human Resources. (DPFOF ¶ 81.) The evidence does not indicate that there were more positions yet to be filled at the time Nelson was added to the list.

Although Nelson testified that Knox told him he was "good to go" and that he believed she verified that his application had been submitted (Nelson Dep. at 122-23), Nelson acknowledged that the Ceridian website showed that he did not apply for the position (*id.* at 108). Nelson further testified that Knox told him to log onto the system again

to verify whether he had applied. (*Id.* at 123.) Nelson does not dispute that Ceridian is the established method for applying for the position. (DPFOF ¶ 65.) He also does not contend that others were put on the certified eligibility list without applying through Ceridian. Thus, even assuming Nelson believed he applied for the position, the Ceridian System showed that he did not.

Thus, as the record stands, there is no evidence that Nelson applied for the position. Because Nelson cannot show that he applied for the position, he fails to make a *prima facie* case under the indirect method.

### 2. Retaliation Under Title VII and § 1981.

Nelson alleges that the defendants retaliated against him for opposing a discriminatory practice in violation of Title VII and § 1981. Nelson's retaliation claims are analyzed under the same framework, whether brought under Title VII or § 1981, *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007); thus, I will analyze both retaliation claims together.

To overcome the defendants' motion for summary judgment, Nelson may proceed under either the direct or indirect methods. *See id.* Under the direct method, Nelson must present direct evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Id.* Under the indirect method, he must show that after opposing the employer's discriminatory practice only he, and not any similarly situated employee who did not complain of discrimination, was subjected to a materially adverse action even though he was performing his job in a satisfactory manner. *Id.* Thus, the indirect "method of establishing a prima facie case

requires proof both of similarly situated employees and of the plaintiff's performing his job satisfactorily." *Id.* (internal quotation and citation omitted).

### 2.1 Materially Adverse Action

The defendants do not dispute that Nelson engaged in a statutorily protected activity when he filed a complaint with the EEOC in December 2011. Because the issue of whether Nelson suffered a materially adverse action is dispositive of his retaliation claims under either the direct or indirect method, I will examine this issue first. Nelson alleges that he was retaliated against when he was excluded from command staff meetings, when he was transferred to a position in the Detention Services Bureau's jail records, and when two internal affairs investigations were initiated against him.

For an employment action to be adverse, "the challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012) (internal quotation and citations omitted). In *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), the Supreme Court stated that "[w]e speak of *material* adversity because we believe it is important to separate significant from trivial harms." (emphasis in original). The Court noted that Title VII is not a "general civility code for the American workplace" and that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." (*Id.*) Rather, the antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms and it does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and

their employers. *Id.* (internal quotation and citation omitted). Normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. *Id.* The Court further stated that "[w]e refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective" because "[i]t avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68-69.

### 2.1.1 Exclusion from Command Staff Meetings

Nelson argues that he was excluded from command staff meetings in retaliation for filing his EEOC complaint. It is undisputed that after Nelson filed his EEOC complaint in December 2011, the persons in command were aware of the complaint. On January 24, 2012 Inspector Schmidt emailed Sheriff Clarke a copy of Nelson's EEOC complaint (PPFOF ¶¶ 61-62) and Inspector Bailey received a copy of the complaint on January 25, 2012 (*id.* ¶ 63). It is further undisputed that on January 31, 2012 Inspector Bailey sent Nelson an email informing him that he was not to attend any command staff meetings (*id* ¶ 63) and that prior to this, Inspector Schmidt had ordered all lieutenants with arrest powers (which included Nelson) to attend the command staff meetings every week (*id.* ¶ 64). It is also undisputed that Nelson was asked to leave a command staff meeting on January 31, 2012 and that after Nelson left, Sheriff Clarke got up in front of the room and began to talk about his ability to make promotions when he wanted and then pointed at Nelson's chair (with his nametag in front of it) saying no one was going to tell him who to promote and mentioned something about loyalty indicating Nelson was disloyal. (*Id.* ¶ 67.) Thus, it appears from the undisputed facts that the impetus to Nelson's exclusion from the command staff meetings was his filing of the EEOC complaint.

However, the issue remains whether Nelson's exclusion from these meetings constitutes a materially adverse action. As the Supreme Court stated in *Burlington Northern*, 548 U.S. at 67, the antiretaliation provision protects an individual "not from all retaliation, but from retaliation that produces an injury or harm." In *Burlington Northern*, the Supreme Court stated that the significance of any given act of retaliation will often depend upon the particular circumstances at hand and used as an example a supervisor's refusal to invite an employee to lunch. The Court stated that this is normally a nonactionable petty slight; however, to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement "might well deter a reasonable employee from complaining about discrimination." 548 U.S. at 69.

Nelson has not shown how his exclusion from the command staff meetings impacted his ability to perform his job or otherwise harmed him. It is undisputed that command staff meetings were generally held every Tuesday morning and that the meetings were business meetings in which various current events were discussed including blunders on the agency, inmate escapes, squad accidents, or new initiatives. (DPFOF ¶¶ 120-21.) It is also undisputed that if any information that was discussed in the command staff meetings was relevant to excluded or absent individuals, those individuals could receive the notes or communicate with their supervisors or co-workers who attended the meetings. (*Id.* ¶ 127.) Nelson does not dispute that his commanding officer, Aisha Barkow, was present at the meetings. (*Id.* ¶ 135.) Because Nelson could receive all relevant information from Barkow, it is unclear how exclusion from the command staff meetings would hinder Nelson's ability to perform his duties. *See, e.g., Lee v. City of Corpus Christi*, 749 F. Supp. 2d 521, 540-41 (S.D. Tex. 2010) (denying summary judgment on "materially adverse" requirement when

exclusion from weekly managers' meeting caused plaintiff to be unable to obtain information she needed to do her job); *Cecil v. Louisville Water Co.*, 301 Fed. Appx. 490, 501 (6th Cir. 2008) (finding that exclusion from a meeting was not a materially adverse action because the plaintiff failed to present enough evidence to show that it was so important as to dissuade a reasonable worker from making or supporting a charge of discrimination).

Nelson also relies on the testimony of his former co-worker, Thomas Meverden ("Meverden"). However, Meverden's testimony does not change the outcome. Meverden testified that he believed that Nelson's exclusion from the meetings was retaliatory and that it had a chilling effect on him personally. (Declaration of Oyvind Wistrom ¶ 2, Exh. 2, Deposition of Thomas Meverden ("Meverden Dep."), Docket # 44-2 at 33-34.)) Once again, whether an action is materially adverse is an objective standard and Meverden's subjective beliefs do not make the action materially adverse. Thus, Nelson has not shown that his exclusion from the command staff meetings constituted a materially adverse action.

### 2.1.2   Transfer to Third Shift Jail Records Supervisor

Nelson argues that his transfer to third shift jail records supervisor was retaliatory because the position did not previously exist and has not since been filled by a sworn lieutenant or sergeant. (Docket # 45 at 17-18.) Lateral transfers constitute a materially adverse employment action if it affects the employee's wages, benefits, responsibilities, or working conditions. *See Mercer v. Cook Cnty., Ill.*, 527 Fed. Appx. 515, 522 (7th Cir.2013) ("[A] mere transfer—without more, such as a reduction in pay or significantly diminished responsibilities or working conditions—falls below the level of an adverse employment action necessary to support a claim of discrimination or retaliation."). Even assuming the job did not exist before Nelson held it and that it has not since been filled by a sworn law

enforcement officer, Nelson does not dispute that his salary, benefits, and opportunities for promotions remained consistent, even as a third shift jail records supervisor. (DPFOF ¶ 18-19.) Nelson further argues that the transfer sent a "clear message from the Sheriff" that if you file an EEOC complaint "you'll be sent to Siberia" (Docket # 45 at 18) and cites the deposition testimony of his former co-worker, Meverden, that he would have considered the reassignment retaliatory. (Meverden Dep. at 24-25). However, the relevant issue is whether the transfer adversely affected Nelson, not whether his co-workers perceived the transfer as a punishment. *See Garza v. Wautoma Area School Dist.*, 984 F. Supp. 2d 932, 942 (E.D. Wis. 2013). Nelson has not shown his reassignment was materially adverse.

### 2.1.3   Internal Investigations

Nelson argues that he was retaliated against for filing his EEOC complaint when he was first informed on February 8, 2012 about two internal affairs investigations against him. Although Nelson disputes whether the complaint against him was initially described to him as one for sexual harassment, he does not dispute that internal affairs initiated the investigation on October 24, 2011. (DPFOF ¶ 38.) Nelson does not dispute that a second internal affairs investigation was initiated again him on November 17, 2011 based on a different allegation. (*Id.* ¶ 45.) It is undisputed that due to the close timing of the complaints, the officers in charge of the two investigations attempted to coordinate their cases to expedite the investigations. (*Id.* ¶ 48.) It is undisputed that the internal affairs investigator notifies the subject of the investigation and brings him or her in for an interview as the last step of the investigative process. (*Id.* ¶ 32.)

Although Nelson testified that he believed that internal affairs would not have waited four months to act on an allegation of sexual harassment (Nelson Dep. at 225), he does not

dispute that internal affairs was working with only two to three investigators, with each investigator having approximately 20-24 cases at any given time, and that because of the heavy caseload, the investigators were required to prioritize their cases based on risk and security factors (DPFOF ¶¶ 36-37.) Nor does Nelson dispute that at least some action was taken after the initiation of the investigation and before the filing of the EEOC complaint, such as interviewing the complaining officer on October 28, 2011. (*Id.* ¶¶ 41-42.) As such, Nelson cannot show that the mere act of informing him of the investigation after the EEOC complaint was filed, for an investigation that was commenced prior to the filing of the EEOC complaint, constitutes an adverse employment action.

Because Nelson has failed to present either direct or indirect evidence of a materially adverse action taken by his employer, his retaliation claim fails under either method of proof.

## CONCLUSION

Nelson has offered no evidence from which a reasonable jury could conclude that the defendants discriminated against him based on his sex and race and retaliated against him for exercising his rights under Title VII and § 1981. With regard to Nelson's discrimination claims, Nelson failed to produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated the MCSO's failure to promote him to the position of Deputy Sheriff Captain. Further, Nelson has not shown under the indirect method of proof that he applied for the position. Finally, because Nelson failed to show he was subjected to a materially adverse action, his retaliation claims fail. As such, the defendants' motion for summary judgment is granted.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that Defendants' Motion for Summary Judgment (Docket # 37) is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 13th day of May, 2015.

BY THE COURT:

_s/Nancy Joseph_
NANCY JOSEPH
United States Magistrate Judge